UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DEBORAH HIRSCHBERG,

                                    Plaintiff,                    **<u>MEMORANDUM & ORDER</u>**

         -against-                                               08 CV 1611 (DRH) (AKT)

BANK OF AMERICA, N.A.,

                                    Defendant.
-------------------------------------------------------------X
**APPEARANCES:**

**GABOR & GABOR**
Attorney for Plaintiff
400 Garden City Plaza
Suite 406
Garden City, New York 11530
By:     David George Gabor, Esq.
         Hope Senzer Gabor, Esq.

**EDWARDS ANGELL PALMER & DODGE LLP**
Attorney for Defendant
111 Huntington Avenue
Boston, Massachusetts 02199
By:     Alice A. Kokodis, Esq. (Admitted *Pro Hac Vice*)

**MCANDREW CONBOY & PRISCO LLP**
Attorney for Defendant
95 Froehlich Farm Boulevard
Woodbury, New York 11797
By:     Craig M. Dolinger, Esq.


**HURLEY, Senior District Judge:**

         Plaintiff Deborah Hirschberg ("Plaintiff") brings the present action against defendant

Bank of America, N.A. ("Defendant" or the "Bank") for violations of the Age Discrimination in

Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL"),

claiming that she was discriminated against on the basis of her age. Defendant has moved for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow,

Defendant's motion is granted and this case is dismissed in its entirety.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local Civil Rule 56.1

Statements, are undisputed unless otherwise noted.

**A.**  *Plaintiff's Employment with Defendant Prior to 2007*

Plaintiff, born on May 31, 1956, was hired by Defendant in August 1976 as a Teller.  She

was promoted to Senior Teller and, in 1979, became the Head Teller.  In 1981, Plaintiff became

the Banking Officer and was subsequently promoted to Assistant Branch Manager in 1985.  In

1995, Plaintiff was promoted to the position of Branch Manager[1] of the East Rockaway branch

(the "Branch") in East Rockaway, New York and held that position until her employment was

terminated on October 5, 2007.   As Branch Manager, Plaintiff was responsible for running the

Branch, bringing in business to the Branch, and overseeing the sales, incentive goals, and

coaching of the staff.  While Plaintiff claims that the Assistant Branch Manager was responsible

for opening accounts, Defendant disagrees and states that sales and service specialists, personal

bankers, and sales associates could open accounts.  According to Defendant, after a sales

associate opened an account, it was the responsibility of either the Branch Manager or the

Assistant Branch Manager to review the account opening documents.

Both parties agree that Plaintiff's career proceeded smoothly and without incident until

2007.  Plaintiff contends that she "frequently went above and beyond for the benefit of the bank

---

[1]      Defendant refers to this position as a "Banking Center Manager," (*see* Def.'s 56.1
¶ 4), but do not appear to object to Plaintiff's use of the term "Branch Manager" (*see* Def.'s
Response to Pl.'s 56.1 ¶ 64.)

and the community" by working extended hours and on Saturdays.  (Pl.'s 56.1 ¶ 67.)  Plaintiff

also received various awards and recognition for her work.  During her tenure as a Branch

Manager, Plaintiff reported to the Consumer Market Executive ("CME") responsible for

overseeing the East Rockaway Branch.  During the early part of 2007, Marcia Mills ("Mills")

was the CME for the Long Island market, which included East Rockaway, and was Plaintiff's

direct supervisor.  Plaintiff was never disciplined while Mills was her supervisor.  In fact,

Plaintiff was regarded as a top performing manager in the region and was frequently called on by

Mills for help with regional issues.

**B.**     ***Plaintiff's Supervision Changes in 2007***

In or about the end of February or beginning of March 2007, William Cherry ("Cherry")

became the Consumer Market Manger for Plaintiff's area.  In or about August 2007, there was a

realignment of the markets and Anthony Volpicello ("Volpicello")[2] replaced Mills, who

transferred to another position with the Bank.  As CME, Volpicello was responsible for the East

Rockaway Branch, in addition to 43 other banking centers within the newly-created Western

Long Island Market.  Thus, when Mills left her position, Volpicello and Cherry became

responsible for supervising Plaintiff's work.

**C.**     ***Plaintiff's Interactions with Volpicello***

Volpicello was based in Huntington, New York and met Plaintiff on two occasions during

the two months that he supervised her prior to her termination.  First, Volpicello met Plaintiff at a

managers meeting in early August 2007.  During that meeting, Volpicello introduced himself to

the managers within his new market and spoke generally about the Bank's sales goals.  Plaintiff

---

[2]          Volpicello, born June 4, 1965, was 42 years old in 2007.

alleges that during this meeting, Volpicello "made a face" when she told the group of managers that she had worked for Defendant for thirty-one years. (Pl.'s Dep. at 77.) Additionally, Plaintiff "felt" that Volpicello saw her as a liability rather than as an asset because he failed, during this meeting, to recognize her tenure or the accomplishments of the East Rockaway Branch. (*Id.*) Plaintiff further asserts (and Defendant denies) that Volpicello and Cherry both focused on the younger managers attending the meeting. (Pl.'s 56.1 ¶ 81.) Volpicello and Plaintiff did not speak with each other outside the meeting and had no further interactions that day.

The second time Plaintiff met Volpicello was in September 2007, when Volpicello joined the East Rockaway Branch for its morning daily connect meeting. After the meeting, which ran for approximately 15 minutes, Plaintiff gave Volpicello a brief tour of the Branch. Plaintiff testified during her deposition that while Volpicello did not say anything inappropriate during this visit, he was "extremely cold" to her. (*Id.* ¶ 85.)

**D.    *The Three Audits Conducted of the Branch***

Audits are operational reviews of policies and procedures of the banking centers and are conducted by the Banking Center Control Review ("BCCR"), a separate department within the Bank that has no reporting relationship to the CMEs. In 2007, Alfred Mayo ("Mayo") was the manager of the BCCR. The audits are performed unannounced and the auditors use a "checklist of things that they . . . review, and then the [Branch] performance is scored." (Lynch Dep. at 51.) That audit score is then shared with the Branch Manager and Assistant Branch Manager. (*Id.*) Plaintiff testified that after the audit is completed a report is prepared and provided to the Branch Manager during an "exit interview" attended by the Branch Manager, Assistant Branch Manager, and auditors. (Pl.'s Dep. at 97.)

The East Rockaway Branch was audited three times in 2007. The Branch failed its first audit, which was conducted in January 2007, and was therefore subject to another audit approximately 60 to 90 days later. (*See id.* at 100.) The Branch passed the second audit, which was conducted on April 18, 2007. Despite passing the second audit, however, the Branch was still considered "high risk" due to prior robberies and because at some point earlier in the year a long-term employee was found to have embezzled over $250,000 from the Bank.[3] Therefore, the BCCR conducted a third of the East Rockaway Branch on October 1, 2007. That evening, after the conclusion of the audit, the auditors held an exit interview with Plaintiff and Jennie Cankat ("Cankat"), the Assistant Branch Manager, to review their findings. Volpicello was not present during the third audit or exit interview, but learned of the audit results the following day. (Volpicello Dep. at 81.)

During the exit interview, the auditors advised Plaintiff that the audit uncovered four newly-opened business accounts and one newly-opened personal account which were not opened pursuant to proper Bank procedures. The auditors also advised Plaintiff that she was listed as the responsible associate on two of the questionable accounts. Lois Anderson ("Anderson"), a Personal Banker working at the Branch who was 60 years old at the time, was the opening associate on the remaining three accounts. On October 2, 2007, Mayo sent an email to Volpicello concerning the findings of the audit, which stated as follows:

---

[3] The embezzlement was discovered in January or early February 2007. After an investigation, it was determined that the embezzlement occurred over a period of several years and would have been impossible to uncover if the employee had not confessed to the fraud in early Spring 2007. The fact that money had been stolen from the Branch did not impact Defendant's opinion regarding the quality of Plaintiff's work and she continued to receive good performance ratings after the theft took place.

During our review of the East Rockaway office, five accounts recently opened clearly were not signed for by the customer. Looking at these accounts it appears that the account opener (BCM D. Hirschberg and PB Lois Anderson) pasted a copy of the customer signature to the signature card. This is in direct violation of the Bank Standard procedure. Signature cards are signed in original as it is the only legal contract between the bank and the customer. In addition, the signature of the customer also acknowledges receipt of the Deposit Agreement and Disclosures and appropriate fee schedule, verifies agreement with the terms and conditions of the account and certified the Taxpayer Identification Number (TIN). Although we cannot be sure of the intents around this the ethics issues that arise are numerous while also placing the bank at both a compliance and legal risk.

(Def.'s 56.1 ¶ 32.)[4]

According to Defendant, Volpicello then reviewed the audit findings and spoke with Mayo as well as his human resources representative, Tracy Brown ("Brown"), and his manager, Jeffery Barker ("Barker"). Defendant asserts that during this conversation, Volpicello, Mayo, Brown and Barker agreed that Plaintiff's conduct clearly violated the Bank's "Code of Ethics and General Policy on Insider Trading" ("Code of Ethics"),[5] but that Volpicello should interview Plaintiff and Anderson to better understand the circumstances surrounding their actions.

**E.**    ***The October 3, 2007 Meeting***

On October 3, 2007,[6] Volpicello and Cherry met with Plaintiff in her office for about

---

[4]    This email, which Defendant identifies as Exhibit 10 marked during Plaintiff's deposition and Bates-stamped 486-487 (*see* Volpicello Dep. at 99), was not included in Defendant's submission to the Court, but is copied verbatim into Defendant's Local Civil Rule 56.1 Statement. Plaintiff does not dispute that this was the actual text of the email, and so the Court will treat it as such. (*See* Pl.'s Response to Def.'s 56.1 ¶ 32.)

[5]    *See generally* Pl.'s Dep., Ex. 4.

[6]    There is some dispute between the parties as to whether this meeting took place on October 3, 2007 (as Plaintiff recalls) or October 4, 2007 (as Volpicello testified during his

thirty minutes to review the findings of the audit. Volpicello showed Plaintiff the audit report and asked her to explain why some of the signature cards for accounts that she opened did not appear to have original customer signatures. Plaintiff admitted that she copied and pasted the signatures of two customers from old Bank documents because she knew the customers well and was trying to accommodate their wishes. (Hirschberg Aff. ¶ 54.)[7]

With respect to the first account, opened by Plaintiff on June 25, 2007, Plaintiff testified during her deposition that a long-time client asked Plaintiff if she could cash a check made out to a corporation. Plaintiff informed her that she could not and would have to deposit it in an account. The client told Plaintiff that the account had been closed. Plaintiff pulled the paperwork for the closed account and offered to open a new account for the client. When the client indicated that her husband should be named on the account also, Plaintiff told her that he would have to come in and sign certain documents. However, the client stated that her husband would be out of town for two weeks. Plaintiff testified that she telephoned the husband and informed him that she was going to open an account in his name and would use his signature that was on the old documentation already on file. (*See* Pl. Dep. at 120-21.) According to Plaintiff, this was "not a normal practice." (Hirschberg Aff. ¶ 54.)

As for the second account, which Plaintiff opened on August 24, 2007, Plaintiff testified that she opened a personal account for a long-time customer and gave him a Yankees t-shirt as part of a Bank promotion. The client asked for a second t-shirt so that he would have two shirts

---

deposition). Because Defendant agrees that the meeting could have taken place on October 3, 2007, the Court assumes that this is the correct date. (*See* Def.'s 56.1 ¶ 34.)

[7] "Hirschberg Aff." refers to the Affidavit of Deborah Hirschberg, dated January 20, 2010.

to give to his twin sons. Plaintiff informed him that he would need to open another checking account to receive a second t-shirt, and the client told her to open a checking account for his wife. Plaintiff testified that she called the client's wife and got her driver's license information and told her that she would open the account. Plaintiff further testified that she held the signature card for two weeks while she waited for her client's wife to come in to sign the paperwork. Although Plaintiff testified that she informed the client that his wife would need to come into the Bank and sign the signature card, eventually Plaintiff just photocopied the client's wife's signature from an existing signature card. (*See* Pl.'s Dep. at 122-23.)[8]

According to Plaintiff, during the exit interview following the October 1, 2007 audit, the auditors told her that she could use existing cards to open new accounts if all the signatories were not present by pulling up an image of an old signature card,[9] crossing out the old account number, adding the new account number, and having the customer who was present initial the change.[10] Plaintiff asserts that the only difference between using this approach and copying and pasting signatures is "cosmetic." (Pl.'s 56.1 ¶ 95.) Plaintiff further contends that she never admitted during the October 3, 2007 meeting with Volpicello that she failed to follow Bank policy in connection with opening the two accounts in question. (Hirschberg Aff. ¶ 54.) Plaintiff

---

[8]     In her affidavit submitted in opposition to summary judgment, Plaintiff contends that when she initially spoke with the client's wife on the phone, she indicated that she was too busy to come to the Bank. According to Plaintiff's affidavit, the client's wife informed Plaintiff that since she had just opened an account the previous week, Plaintiff could use her signature that was already on file. (Hirschberg Aff. ¶ 54.)

[9]     The original signature cards are generally imaged and then destroyed.

[10]     Defendant contends the auditors informed Plaintiff and Cankat that when opening an account they could use copies of legal documents already on file, but that they still had to obtain new signature cards. (Def.'s Response to Pl.'s 56.1 ¶ 91.)

also testified that cutting and pasting customer's signatures onto signature cards to open new accounts was "not a normal procedure," but that she did it on the two occasions described above "to help [the customers] . . . [because] [w]e had an account with them before."  (Pl.'s Dep. at 254.)

According to Defendant, Volpicello and Cherry also interviewed Anderson about the accounts flagged by the October 1, 2007 audit, but Anderson did not recall the specific accounts at issue and denied cutting and pasting any customers' signatures.  (Def.'s 56.1 ¶ 41.)  Anderson informed Volpicello and Cherry that it was Plaintiff's common practice to use customer signatures from older signature cards if she found signature cards that were not properly executed.  (*Id.*)

**F.    *Plaintiff's Employment is Terminated***

Defendant asserts that on October 5, 2007, Volpicello, Brown, Barker and the Bank's human resources department made a joint decision to terminate Plaintiff's employment. Defendant further asserts that a decision was made to administer Anderson a final written warning because, despite denying that she cut and pasted customers' signatures, she had knowledge that Plaintiff was engaging in such conduct and did not report it.  Anderson was advised that any further violations would result in immediate termination.  That same day, Volpicello and Cherry informed Plaintiff that her employment was being terminated based upon her violations of the Bank's Code of Ethics.

**G.    *Applicable Bank Policies***

**1.    Account Opening Procedures**

Plaintiff testified that in 2007 the Bank had procedures in place (the "Account Opening

Procedures" or "Procedures") for opening new corporate or personal bank accounts. The parties

agree that the Procedures provided that when opening a new account, a customer must provide

two forms of identification, including a social security number. In addition, the customer must

execute a signature card. Plaintiff admitted during her deposition that the Procedures were

available on the Bank's intranet. (Pl.'s Dep. at 67.)

Defendant asserts that the signature card is a legal document between the customer and

the Bank where the customer certifies, under penalty of perjury, that the customer has provided

certain accurate information, including his social security number, proof of United States

residency, and the existence of any tax liens. According to Defendant, the signature card also

notifies the customer of the Bank's obligations under the law as well as the terms and conditions

associated with the account. During her deposition, Plaintiff testified that in order to open a new

personal or business account, she would need to obtain the customer's original signature on the

signature card. (*Id.* at 56-57, 65-67.) The parties both recognize the importance of obtaining

customers' original signatures and agree that even existing Bank customers must execute a new

signature card with each new account they open.

Plaintiff admits that she did "copy and paste signatures for well-known customers on an

extremely infrequent basis" as part of "an effort to accommodate important customers of the

bank." (Hirschberg Aff. ¶ 37.) Plaintiff asserts, however, that "[a]t the time that [she]

accommodated the customers, this was not a violation of bank policy." (*Id.*) Plaintiff further

contends that it was only after her employment was terminated that the Bank changed its policies

to reflect that copying and pasting signatures was not permitted. Plaintiff notes that a document

entitled "Account Opening Procedures: Personal Accounts," which was apparently marked and

used as an exhibit during Plaintiff's deposition, has a notation indicating that it was "Revised 02/20/08" – approximately four months after her termination.  (*See* Pl.'s Dep., Ex. 7.)  Defendant insists that copying or cutting and pasting customer signatures has always constituted a violation of Bank policy and emphasizes Plaintiff's own deposition testimony that no Bank policy expressly permits an employee to cut a signature from an existing document and paste it onto another.  (*See* Pl.'s Dep. at 124.)  Defendant contends that the "Account Opening Procedures: Personal Accounts" document, as revised in February 2008, does not contain any substantive differences from the Procedures in effect in 2007.  (*See* Giangrande Dep. at 16-17.)

### 2.    Code of Ethics

In 2007, the Bank also had a Code of Ethics in place.  (*See* Pl.'s Dep., Ex. 4.)  The Code of Ethics provided, *inter alia*, that "[v]iolations of the Code . . . constitute[ ] grounds for disciplinary action, including termination of employment."  (*Id.*, Ex. 4 at 15.)  On August 5, 2005, Plaintiff signed an Acknowledgment Form setting forth that she had read, understood, and agreed to comply with the Code of Ethics.  (*Id.*, Ex. 5.)

### H.    *Plaintiff's Allegations Regarding the Third Audit*

Plaintiff recalls, prior to 2007, that the East Rockaway Branch was audited, on average, twice per year.  Those audits would typically include a review of bank records from the prior six to eight weeks and were typically staffed by no more than two auditors.  Plaintiff contends that the October 1, 2007 audit was performed by three auditors instead of two, and those auditors covered a much broader scope and reviewed more records than ever before.  Specifically, Plaintiff did not recall any prior audit reviewing records older than six to eight weeks, but the October 1, 2007 audit included records that went back at least 110 days.

**I.**   *Bank's Alleged Failure to Use Progressive Discipline*

Plaintiff testified that she had never before received any disciplinary action during the 31 years that she worked for the Bank.  According to Plaintiff, the Bank has a policy of progressive discipline that starts with verbal counseling, and then progresses to written warnings and then a final warning, after which an associate's employment could be terminated.  Plaintiff asserts that Defendant did not follow this progressive discipline policy in her case.  The Defendant contends that falsification of Bank documents, including signature cards, is a violation of the Bank's Code of Ethics and all violations of the Code of Ethics are subject to immediate termination.

**J.**   *Plaintiff is Replaced by a Younger Employee, Who is Also Terminated*

On November 15, 2007, Aneta Dowlatram ("Dowlatram") was promoted to replace Plaintiff as the Branch Manager of the East Rockaway Branch.  A few months later, on January 14, 2008, Dowlatram was terminated for falsifying Bank documents in violation of the Code of Ethics.  Specifically, the Bank discovered that Dowlatram was cutting customer signatures and pasting them on signature cards for the purpose of opening new bank accounts.  Dowlatram was 39 years old (12 years younger than Plaintiff) at the time of her termination.  The parties agree that Dowlatram's termination occurred after Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 26, 2007.

**K.**   *Plaintiff Contends that Other Employees Who Engaged in the Same Conduct Were Not Terminated*

Plaintiff testified during her deposition that she was treated differently than other Bank employees who were also allegedly cutting and pasting signatures.[11]  According to Plaintiff, "[i]t

---

[11]     In the excerpts of Plaintiff's deposition provided to the Court, Plaintiff testified that she knew of four other Bank employees who cut and pasted signatures: Marcia Adika, Nancy

was common practice to open accounts when customers were not present and [ ] copy and paste an existing signature . . . ." (Pl.'s 56.1 ¶ 116.) Plaintiff asserts that the Bank "was putting tremendous pressure on associates to open as many accounts as possible and [ ] looked the other way regarding account opening procedures." (*Id.*) According to Julian Huertas, another Branch Manager who was responsible for rectifying accounts with missing signatures, an account with a missing signature would have to be closed which would, in turn, effect the associates' target goals and, ultimately, their income. (Huertas Aff. ¶ 4.)[12] Therefore, it was "commonplace for Bank associates to 'do what was needed to do to get numbers,'" including cutting and pasting signatures. (*See id.* ¶¶ 4, 5.) Huertas also testified that Bank supervisors and auditors would "'look the other way' and not object to this practice." (*Id.* ¶ 6.)[13]

Defendant denies that cutting and pasting signatures was a "common practice." (Def.'s Response to Pl.'s 56.1 ¶ 116.) Adika, Chiaffitelli, Giangrande, and Anderson all testified during depositions that they did not cut and paste signatures and had never heard of anyone (other than Plaintiff) who did so. (*See* Def.'s 56.1 ¶¶ 48-56.) Defendant further contends that none of the employees deposed in this case, including Plaintiff, "have been able to point to a Bank policy that

---

Chiaffitelli, Patricia Giangrande, and Anderson. Each of these employees was over the age of forty in 2007. (*See* Def.'s 56.1 ¶¶ 48-56.) In Plaintiff's affidavit, Plaintiff claims that an additional seven Bank employees cut and pasted signatures. (*See* Hirschberg Aff. ¶ 40.) Of these additional seven employees, the record shows that one – Carol Harvey – was in her fifties during the relevant time period. There is no evidence as to the ages of the remaining employees.

[12]     "Huertas Aff." refers to the Affidavit of Julian Huertas, dated January 19, 2010.

[13]     According to Huertas, the Bank circulated an email after Plaintiff's termination that implied that the Bank was aware of the "copy and paste" procedure and informed employees that cutting and pasting signatures was not permitted. (Pl.'s 56.1 ¶ 123.) This email was not produced to the Court. Defendant denies this factual allegation.

allows an associate to cut and paste customer signatures." (*See* Def.'s Response to Pl.'s 56.1 ¶ 116.)

**L.     *Plaintiff's Other Allegations of Disparate Treatment by Volpicello***

   **1.     Volpicello's Alleged Intent to "Get[] Rid of Older Management"**

Plaintiff alleges that shortly after Volpicello took his position as CME in the new Western Long Island market, "it became clear that he was intent on getting rid of older management." (Pl.'s 56.1 ¶ 80.)  By way of example, Plaintiff states that within the first several months in his new position, Volpicello "forced out Carol Harvey, a Branch Manager in her late 50's and replaced her with Larry Hall who is approximately ten (10) years younger than her." (*Id.*) Plaintiff further asserts that "Linda Enbar, a Branch Manager[ ] who was in her 50's was also forced out." (*Id.*)  Defendant denies these assertions and states that Carol Harvey was terminated after admitting to purchasing illegal drugs in the ATM vestibule.  (Def.'s Response to Pl.'s 56.1 ¶ 80.)  Defendant further states that Enbar was terminated, with the involvement of the Bank's Advice & Counsel Department, when her failure to follow policy and procedure resulted in a $94,000 loss to the Bank.  (*Id.*)  Finally, Defendant asserts that Volpicello has no knowledge of Enbar's age.

   **2.     Plaintiff's Poor Performance Reviews**

According to Plaintiff, Volpicello formally rated Plaintiff's work performance twice during the time that he supervised her.  His third quarter review rated her performance as follows: Plaintiff's "Results Rating" was "Meets Expectations" and her "Behavior Rating" was "Does Not Meet Expectations." (Hirschberg Aff., Ex. L.)  Volpicello's 2007 year end review rated Plaintiff's "Results Rating" and "Behavior Rating" as "Does Not Meet Expectations." (*Id.*)

Plaintiff asserts that "Volpicello could not point to any activity on Hirschberg's part to warrant a poor review based upon her performance during the time that he supervised her." (Pl.'s 56.1 ¶ 107.) The "Effective Date" listed for the third quarter and year end reviews, respectively, are September 29, 2007 and September 30, 2007. (Hirschberg Aff., Ex. L.) According to Defendant, "[t]he ratings were not made on September 29 and 30, 2007." (Def.'s Response to Pl.'s 56.1 ¶ 105.) Defendant asserts that the "Effective Dates" "reflect[] the end of the [third] quarter" and that "Volpicello [could] only enter rating evaluations approximately two weeks after the [third] quarter end[ed]." (*Id.*) Thus, "Volpicello first issued performance evaluations for managers in the Western Long Island market in mid-October 2007." (Def.'s Response to Pl.'s 56.1 ¶ 104.)

## DISCUSSION

### I.    *Applicable Law and Legal Standards*

####    A.    *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56©).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the

underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

**B.     *Legal Standard for ADEA Claim***

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 252-253 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-511 (1993).

Claims brought pursuant to the ADEA are also analyzed under the McDonnell Douglas burden-

shifting framework. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).[14]

Under *McDonnell-Douglas* and its innumerable progeny, a plaintiff must first establish a

prima facie case of discrimination by showing: "(1) that she was within the protected age group,

(2) that she was qualified for the position, (3) that she experienced adverse employment action,

and (4) that such action occurred under circumstances giving rise to an inference of

discrimination." *Gorzynski*, 596 F.3d at 107. The burden of establishing a prima facie case of

employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*,

42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164,

168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility

assessments. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to

---

[14]     The Supreme Court recently clarified the standard for prevailing on an ADEA claim in *Gross v. FBL Financial Services*, 557 U.S. ----, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Prior to *Gross*, an ADEA plaintiff had to "establish that age was a motivating factor in adverse employment actions." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 505 (S.D.N.Y. 2010) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir. 2001)). *Gross* modified this burden, and requires a plaintiff to "prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employment decision." *Gross*, 129 S.Ct. at 2351. The Second Circuit has held that, despite the modification set forth in *Gross*, the basic burden-shifting paradigm of *McDonnell Douglas* remains applicable to disparate treatment causes of action under the ADEA. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) ("Accordingly, we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit."). "*Gross* increases plaintiff's burden at the third stage of the *McDonnell Douglas* analysis to 'raise[ ] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a "but for" cause of [defendant's] decision to fire her.'" *Mattera v. JP Morgan Chase Corp.*, 2010 WL 3785576, at *7 n.8 (quoting *Gorzynski*, 596 F.3d at 107)).

"articulate some legitimate, nondiscriminatory reason for [the adverse act]." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Should the employer satisfy its burden, the *McDonnell-Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non." *See Reeves*, 530 U.S. at 143. Thus, the Court must "determine, by looking at the evidence [the plaintiff] has proffered and the counter-evidence [the defendant] has presented, whether [the plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause" of the adverse employment action. *Gorzynski*, 596 F.3d at 107. To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than

allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

## C. *Legal Standard for NYSHRL Claim*

It remains an "open question" in the Second Circuit "whether a plaintiff alleging age discrimination under the NYSHRL . . . must establish 'but for' causation" just as an ADEA plaintiff is required to do pursuant to the Supreme Court's decision in *Gross. Saenger*, 706 F. Supp. 2d at 505. The Second Circuit has declined to expressly address the issue, *see Gorzynski*, 596 F.3d at 106 n.6, but has maintained that "[a]ge discrimination claims brought pursuant to the NYSHRL . . . are analyzed under the ADEA framework." *See Leibowitz*, 584 F.3d at 498 n.1; *Mattera*, 2010 WL 3785576 at *7 n.7. Therefore, it appears clear that "[c]laims brought under the New York Human Rights Law . . . are analyzed under the *McDonnell Douglas* burden-shifting framework." *Davey v. Jones*, 371 Fed. Appx. 146, 149 (2d Cir. Mar. 29, 2010). It remains unclear in the Second Circuit, however, "whether the analytical frameworks of the ADEA [and] the NYSHRL . . . will continue to mirror one another after *Gross*." *Alleva v. N.Y. City Dep't of Investigation*, 696 F. Supp. 2d 273, 285 (E.D.N.Y. 2010) (declining to exercise supplemental jurisdiction over the plaintiff's state and local law age discrimination claims). In order words, while courts within this circuit have decided "there is no reason to jettison the

burden-shifting framework for NYSHRL . . . claims," no court has specifically addressed whether NYSHRL age discrimination plaintiffs must prove pretext by showing that "age was the 'but for' cause of the challenged adverse employment action," as is required of ADEA plaintiffs post-*Gross*, or whether plaintiffs attempting to prove pretext in the context of an age claim under the NYSHRL must prove only that "the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Saenger*, 706 F. Supp. 2d at 507 (internal quotation marks and citations omitted).[15]

This Court need not, however, make a determination as to which standard applies to age discrimination claims brought pursuant to the NYSHRL because, for the reasons set forth below, Plaintiff's claims fail under either standard. A reasonable jury could not conclude that age was a motivating factor in the Bank's decision to terminate Plaintiff's employment, and could certainly not conclude that age was the "but for" cause of that decision. *See id.* at 506.

## II.    Plaintiff Fails to Raise a Genuine Issue of Material Fact as to her Claim of Age Discrimination

### A.    Plaintiff's Prima Facie Case

For purposes of this motion, Defendant does not dispute that Plaintiff has established the first three elements of her prima facie case, viz. that she was a member of a protected class,[16] that she was qualified for the Branch Manager position, and that she suffered an adverse employment

---

[15]    *C.f. Weiss v. JPMorgan Chase & Co.*, 2010 WL 114248, at *3-4 (S.D.N.Y. Jan. 13, 2010) ("[I]nstead of carving out a more restrictive causation standard for age discrimination claims under the [New York City Human Rights Law], its "because of" language should continue to be interpreted as requiring a plaintiff to prove only that age was "a motivating factor.").

[16]    This protection extends to employees who are at least 40 years old. *See* 29 U.S.C. § 631(a).

action when she was terminated. Defendant does contend, however, that Plaintiff cannot prove that her employment was terminated under circumstances giving rise to an inference of discrimination.

A plaintiff may satisfy the fourth prong of her prima facie case by demonstrating "the ultimate filling of [her] position with an individual who is not a member of the protected class." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001); *see also Gorzynski*, 596 F.3d at 107 (finding plaintiff established prima facie case when she was "over forty years old, undisputedly qualified for her position, was fired, and was then replaced by a woman in her twenties"). Here, after Plaintiff's termination the Branch Manager position was filled by Aneta Dowlatram, who was thirty-nine years old at the time – twelve years younger than Plaintiff. Accordingly, the Court finds that Plaintiff has established a prima facie case of age discrimination. *See Mattera*, 2010 WL 3785576 at *9 ("Because Chocheles was 12 years younger than plaintiff when plaintiff was fired and replaced by Chocheles, plaintiff has sufficiently raised an inference of discrimination."); *Saenger*, 706 F. Supp. 2d at 507-08 (finding fourth element established when plaintiff was replaced by an employee twelve years younger).

**B.** ***Defendant's Legitimate, Non-Discriminatory Reason***

Once a plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions – a burden that is not particularly onerous.

Here, the Defendant maintains that Plaintiff's employment was terminated because she admitted "to cutting customer signatures in direct violation of the Bank's account opening policies and the Code of Ethics." (Def.'s Mem. at 8.) Plaintiff does not appear to dispute that

this was the stated reason for her termination, although she denies that her conduct constituted either the falsification of a Bank document or a violation of Bank policy. (*See* Pl.'s 56.1 ¶¶ 88, 97.) It is well-settled that Defendant's "burden at this stage is not to prove nondiscrimination." *Mattera*, 2010 WL 3785576 at *9. Rather, Defendant "must 'introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509) (emphasis in the original). "Whether plaintiff can produce evidence casting doubt on [Defendant's] proffered reasons, and what the character of that evidence is, is taken [into] account only at the next stage of the analysis, namely whether [Defendant's] reason is a mere pretext for discrimination." *Id.* (citing *Gorzynski*, 596 F.3d at 107). Accordingly, Defendant's stated reason for the termination of Plaintiff's employment satisfies Defendant's burden at this stage. *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

C.    ***Plaintiff Cannot Present Sufficient Evidence to Demonstrate Defendant's Articulated Reason is a Pretext for Unlawful Discrimination***

Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and "may no longer simply rely on having made out a prima facie case." *Gorzynski*, 596 F.3d at 107. Plaintiff must "present sufficient evidence to permit a rational finder of fact to infer that Defendant's proffered [reason for terminating Plaintiff's employment was] a pretext and that Plaintiff's firing was either the result of age discrimination (under the ADEA), or 'more likely than not based in

whole or in part on [age] discrimination,' (under the NYSHRL . . . if [this] statute[ is] so interpreted)." *Saenger*, 706 F. Supp. 2d at 508 (quoting *Stern v. Trs. of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997)). Plaintiff has failed to meet her burden under either standard.

Plaintiff proffers several arguments why Defendant's stated reasons for her termination were pretextual: (1) there was no clear policy regarding opening accounts and/or prohibiting cutting and pasting signatures; (2) other employees allegedly cut and pasted signatures but were not terminated; (3) Volpicello allegedly "target[ed]" Plaintiff and other "older" Branch Managers; (4) the Bank failed to use its progressive disciplinary policy before terminating Plaintiff; and (5) Dowlatram (Plaintiff's replacement) was also fired for cutting and pasting signatures one month after Plaintiff filed her EEOC Complaint. (*See* Pl.'s Opp'n at 4-6, 7, 10-11.) For the reasons stated below, the Court finds that the evidence in the record, taken as a whole, is insufficient as a matter of law to create a triable issue as to whether Defendant's legitimate, non-discriminatory reason for terminating Plaintiff's employment was pretextual.

As an initial matter, the relevant question before the Court is not whether Plaintiff's conduct actually constituted a violation of any version of the Bank's Account Opening Procedures or Code of Ethics. Plaintiff's burden, at this point, is to put forth "admissible evidence calling into question that the stated reason for [her] termination . . . was not the real reason." *Holowecki v. Fed. Express Corp.*, 644 F. Supp. 2d 338, 354 (S.D.N.Y. 2009). Thus, any disputes as to whether Plaintiff's cutting and pasting signatures actually violated any Bank policies "entirely misses the point that the ADEA allows employers to discharge employees for any reason, so long as that reason is not a pretext for age discrimination, and relevant evidence

would therefore be evidence that suggests, at least circumstantially, that the stated reason was a pretext for such discrimination." *Id.*; *see also Scaria v. Rubin*, 117 F.3d 652, 655 (2d. Cir. 1997) ("[T]his Court does not sit as a super-personnel department that reexamines an entity's business decisions.") (internal quotation marks omitted); *Saenger*, 706 F. Supp. 2d at 509 ("Thus, whether the complaints about Plaintiff were truthful, and whether, if true, they justify termination, are immaterial disputes."). The Court "must ask whether anything about Plaintiff's termination 'undermine[s] the credibility of [Defendant's] stated justification.'" *Saenger*, 706 F. Supp. 2d at 509 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)) (alterations in original).

### 1.    No Clear Policy Regarding Opening Accounts or Prohibiting Cutting and Pasting Signatures

Plaintiff maintains that in 2007 Defendant did not have any clear policy with respect to opening new accounts. (Pl.'s Opp'n at 4-5.) As noted above, the Court may not evaluate whether Plaintiff's conduct actually constituted a violation of any Bank policy sufficient to justify her termination. Evidence, however, that Plaintiff's termination was based upon an alleged violation of a vague or non-existent policy might be relevant to prove pretext. *See Allen v. City of Yonkers*, 803 F. Supp. 679, 708 (S.D.N.Y. 1992) ("[W]hen an employer's reason for the action complained of has been shown to be idiosyncratic, unreasonable or riddled with error and where demeanor evidence and vagueness indicated that a pretext is involved a factfinder may conclude . . . that the alleged reasons are not the true rationale behind the action.").

Plaintiff contends that the Bank's Account Opening Procedures were unclear and points to a document that Defendant marked and used during Plaintiff's deposition, entitled "Account

Opening Procedures: Personal Accounts," that had been revised four months after Plaintiff's termination. (*See* Pl.'s Opp'n at 4-5.) But Plaintiff herself testified that in 2007 procedures did exist that set forth how accounts should be opened, that these procedures were available on the Bank's intranet, and that they required a customer's original signature to open an account. Moreover, Plaintiff has not submitted any evidence that the Account Opening Procedures effective in 2007 differed substantively from those revised in February 2008.[17] Finally, Plaintiff testified that she was aware of no Bank policy that specifically permitted the cutting and pasting of customer signatures. Accordingly, this allegation does not constitute evidence tending to cast doubt on the veracity of Defendant's stated reason for terminating Plaintiff's employment.

### 2.     Other Employees Alleged Engaged in the Same Conduct

Plaintiff contends that other Bank employees were cutting and pasting customers' signatures in order to open accounts, that Defendant knew of this behavior, and that Defendant failed to discipline or terminate those employees. (*See* Pl.'s Opp'n at 6.) Most notably, Plaintiff asserts that "Anderson did the same thing as Hirschberg and was not fired." (*Id.* at 11.) Plaintiff also contends that ten other Bank employees "would copy and paste signatures off of existing signature cards." (Hirschberg Aff. ¶ 40.)

After reviewing the record, the Court finds these allegations unsupported by admissible evidence and insufficient to prove pretext. "Just because one is . . . terminated while others are

---

[17]     Plaintiff also relies on a statement in an affidavit made by Julian Huertas, another former Branch Manager employed by the Bank between 2002 and January 2009, that he first became aware that the Bank "had a problem with the 'copy and paste' method for signature cards" when he received an email after Plaintiff's termination directing Bank employees to cease this practice. (Huertas Aff. ¶¶ 8, 9.) Huertas subsequently testified during his deposition, however, that Bank policy requires a customer to sign a signature card and that this had "always been the policy" while he was employed by Defendant. (Huertas Dep. at 36.)

retained does not, without more, demonstrate discrimination." *Mattera*, 2010 WL 3785576 at

*11. "[V]ague claims of differential treatment alone do not suggest discrimination, unless those

treated differently are 'similarly situated in all material respects.'" *Saenger*, 706 F. Supp. 2d at

514 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also*

*Mattera*, 2010 WL 3785576 at *11 ("Absent some evidence that other employees 'similarly

situated in all material respects' were treated differently, the mere fact that one employee

suffered some non-facially-discriminatory disparate treatment cannot prove pretext.").

First, Plaintiff has not shown that she and the eleven other Bank employees to whom she

compares herself are "similarly situated in all material respects." During her deposition, Plaintiff

identified four comparators (Adika, Chiaffitelli, Giangrande, and Anderson) who had allegedly

cut and pasted customer signatures but had not been disciplined by the Bank.[18] (Pl. Dep. at 142-

47.) Each of these women specifically denied, in testimony given under oath, ever cutting and

pasting customer signatures. (*See* Adika Dep. at 14-15; Chiaffitelli Dep. at 18; Giangrande Dep.

at 26; Anderson Dep. at 23.) Plaintiff has not submitted any evidence, aside from her own

unsupported allegations, to the contrary. *Cf. Gorzynski*, 596 F.3d at 108-09 (plaintiff submitted

evidence that younger employees who ignored or violated work rules were promoted while

plaintiff was terminated). Although not mentioned in the deposition excerpts provided to the

Court, Plaintiff's affidavit lists seven other comparators who also allegedly cut and pasted

---

[18]     Plaintiff testified that: (1) Adika had told Plaintiff that she cut and pasted
signatures; (2) Chiaffitelli had said she cut and pasted signatures while working at the Mineola
Branch; and (3) Anderson told Plaintiff that Giangrande had cut and pasted signatures while
working at the Mineola Branch. (Pl. Dep. at 142-46.)

signatures.[19]  (Hirschberg Aff. ¶ 40.)  Other than stating, in conclusory fashion, that "I know that this was done" (*see id.*), Plaintiff provides no specific factual information to substantiate her claim that any of these seven individuals ever actually cut and pasted customer signatures or admitted to doing so.

Moreover, Plaintiff has not produced any evidence that the Bank knew or should have known that any of these comparators (aside from Anderson, who is discussed below) cut and pasted customer signatures.  Plaintiff testified that she never reported Adika's statement to the Bank (Pl. Dep. at 143), and Plaintiff further testified that she did not know if the Bank had knowledge of Chiaffitelli's and Giangrande's alleged cutting and pasting (Pl. Dep. at 146, 147). As for the seven additional comparators listed in Plaintiff's affidavit, Plaintiff does not set forth whether the Bank knew that these individuals were cutting and pasting, other than to summarily state that "[i]t was common knowledge."  (Hirschberg Aff. ¶ 40.)

In any event, even assuming the truth of Plaintiff's allegations that these comparators cut and pasted customer signatures and that the Bank knew about it, there is no evidence in the record before the Court that any comparator held the position of Branch Manager at the time their alleged cutting and pasting took place.  *See Gorzynski*, 596 F. 3d at 109 n.7 (noting that "an employee's position is relevant to the analysis," although "employees need not be of the exact same rank to be considered 'similarly situated'").  Although it appears from the record that Carol

---

[19]    It is unclear to the Court whether Plaintiff testified about these seven individuals during her deposition.  After Plaintiff testified about Adika, Chiaffitelli, Giangrande, and Anderson, Plaintiff was asked: "So we mentioned Lois [Anderson], Marcy [Adika], Nancy [Chiaffitelli], and Patricia [Giangrande] as other individuals who you claim . . . ."  (Pl. Dep. at 149.)  The deposition transcript excerpt provided to the Court does not contain the remainder of this question, which the Court presumes asks about any other individuals whom Plaintiff alleges cut and pasted signatures, or Plaintiff's response.

Harvey (a comparator listed in Plaintiff's affidavit) was a Branch Manager at the time of her termination and Giangrande was an Assistant Branch Manager turned Acting Branch Manager who "stepped down" to become a personal banker, Plaintiff has offered no evidence that Harvey or Giangrande cut and pasted signatures while they worked as Branch Managers. Furthermore, there is no record evidence to suggest that any of the remaining comparators ever held the position of Branch Manger – Adika and Anderson were Assistant Branch Managers and Chiaffitelli was a sales and service specialist.[20] *See Holowecki*, 644 F. Supp. 2d at 354 (finding plaintiff failed to proffer admissible evidence that his termination was age-related when he "did not attempt to demonstrate that [four younger employees] were [ ] treated [more favorably] under circumstances similar to [his]").

Finally, it is undisputed that at least five of the comparators that Defendant allegedly treated more favorably than Plaintiff were also in the protected class. (*See* Def.'s 56.1 ¶¶ 31, 49, 51, 53; Pl.'s 56.1 ¶ 80.) In particular, Anderson – whom Plaintiff alleges received only a written warning for engaging in the same conduct for which Plaintiff was terminated – was sixty years old in October 2007. (*See* Def.'s 56.1 ¶ 31.) This certainly undercuts Plaintiff's theory that any difference in discipline between Plaintiff and Anderson for the same conduct was age-based.[21] *Goldman v. Admin. for Children's Servs.*, 2007 WL 1552397, at *6 (S.D.N.Y. May 29, 2007) ("In order to raise an inference of discrimination, plaintiff must show that she was 'similarly

---

[20]    Plaintiff has put forth no evidence before the Court as to the positions held by the remaining comparators listed in her affidavit.

[21]    Plaintiff's argument that Anderson was treated differently from Plaintiff because Anderson "was on a different level" and that "Volpicello was targeting Branch Managers and not subordinates" lends further support for the Court's conclusion that Plaintiff and Anderson were not similarly situated. (*See* Pl.'s Opp'n at 13.)

situated in all material respects' to an individual '*outside [her] protected group*' who was treated preferentially to her.") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)) (emphasis added). Moreover, Plaintiff has not provided this Court with any evidence as to the ages of the remaining comparators.

In short, Plaintiff has submitted no evidence that Defendant preferentially treated other similarly-situated employees outside the protected group who engaged in the same conduct as Plaintiff.

### 3. Volpicello's Alleged "Target[ing]" of Plaintiff and Other "Older" Branch Managers

Plaintiff asserts that Volpicello "targeted" Plaintiff for termination before the October 1, 2007 audit ever took place. (Pl.'s Opp'n at 4.) As support for this contention, Plaintiff argues that: (1) the poor performance reviews "issued on" September 29 and 30, 2007 were "not supported by any facts"; (2) three auditors conducted the October 1, 2007 audit, "which was unprecedented in Hirschberg's experience"; and (3) "the auditors went much further back in time as compared to all prior audits that Hirschberg had." (*Id.*)

The problem with this allegation is, essentially, that Plaintiff does not submit any evidence that any of the actions taken by Volpicello (or anyone else employed by Defendant, for that matter) were motivated by an age-based discriminatory animus.[22] Even accepting as true Plaintiff's allegations that Volpicello was "cold, indifferent and dismissive" towards her on the

---

[22] Volpicello was 42 years old, nine years younger than Plaintiff, when he terminated Plaintiff's employment in October 2007. While "a member of a protected class may discriminate against fellow members . . . a number of courts have recognized that they are less likely to do so than nonmembers of the protected class." *Saenger*, 706 F. Supp. 2d at 510 n.9 (collecting cases).

two occasions that they met face-to-face (Pl.'s Opp'n at 2) or that Volpicello "did not respond or acknowledge" Plaintiff's statements about her length of service during a meeting (Pl.'s 56.1 ¶ 81), the Court finds that a reasonable trier of fact could not make the inferential leap that Defendant's stated reason for terminating Plaintiff's employment was pretextual. Plaintiff alleges that Volpicello gave her unjustified poor performance reviews, and then "overstaffed the [October 1, 2007] audit . . . [and] had the auditors dig much deeper than they ever had done before . . . to find dirt to justify the poor reviews so that they could have a reason to get rid of an older Branch Manager." (Pl.'s Opp'n at 10-11.) This theory, however, is simply not supported by any evidence on the record before the Court.

Plaintiff argues that Volpicello gave her a poor performance review and a poor year end review on September 29 and 30, 2007, respectively, even though "there was no reason to give her poor reviews," and then Plaintiff was "terminated from her job within the next week." (*Id.* at 11.)[23] However, Plaintiff has not produced any evidence that her age played any role in the poor performance reviews she received. *See Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 264 (S.D.N.Y. 1999) ("In any event, plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim."); *Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely disagreeing with a supervisor's assessment of work performance, however, is insufficient to raise a triable issue of fact regarding pretext.") (internal quotation marks omitted). Moreover, Plaintiff's claim that she received good performance evaluations in the past does not demonstrate that her final performance reviews were unjustified.

---

[23]     Defendant contends that, despite the "Effective Dates" listed on the documentary evidence relied upon by Plaintiff, the performance reviews were not "issued" before Plaintiff was terminated on October 5, 2007. (Reply Mem. at 6-8.)

*See Mattera*, 2010 WL 3785576 at *13 ("Even if credited, plaintiff's claim of prior favorable performances does not, without more, prove his subsequent poor reviews were unwarranted."); *Iverson*, 2009 WL 3334796 at *5 ("[D]emonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext.") (internal quotation marks omitted).

Furthermore, Plaintiff has produced no evidence to support her allegation that the October 1, 2007 audit was overstaffed and that the auditors were given authorization to "dig much deeper" than normal in order to "find dirt to justify the poor reviews." (*See* Pl.'s Opp'n at 10-11.) It is undisputed that the BCCR department that conducts banking center audits is "a separate department within the Bank that has no reporting relationship to [ ] CMEs" such as Volpicello. (Def.'s 56.1 ¶ 21.) There is simply no evidence in the record to suggest that Volpicello played any role in assigning three auditors to conduct the October 1, 2007 audit or that he directed those auditors to expand the normal scope of their review. In short, Plaintiff has put forth no admissible evidence demonstrating that the October 1, 2007 audit was conducted with the purpose of uncovering "dirt" to support her poor performance reviews.

Finally, Plaintiff alleges that "several other older Branch Members were also forced out of their positions" as part of Volpicello's campaign to target older Bank employees. (*See* Pl.'s Opp'n at 6.) In particular, Plaintiff states that within the first several months of Volpicello's tenure as CME both Carol Harvey and Linda Enbar, Branch Managers over the age of 50, were "forced out" of their positions. (Pl.'s 56.1 ¶ 80.) This proffered theory that Defendant engaged in a pattern of terminating older Branch Managers, however, cannot constitute evidence of pretext because "it does not meet certain minimal standards." *Saenger*, 706 F. Supp. 2d at 515.

First, to the extent Plaintiff intends that this evidence be "considered as statistical evidence, plaintiff's 'sample' of two [is] clearly insufficient to sustain a reasonable inference that [Plaintiff's] treatment by the [Defendant] was motivated by discriminatory intent." *McCarthy v. N.Y. City Technical Coll. of the City Univ. of N.Y.*, 202 F.3d 161, 165 (2d Cir. 2000). Moreover, relevant and admissible statistical evidence "must be supported by expert analysis," which has not been provided here. *See Saenger*, 706 F. Supp. 2d at 515-16. In fact, Plaintiff has failed to submit any evidence that would complete the relevant statistical picture – by demonstrating, for example, the ages of each Branch Manager that was fired (and *not* fired) by Volpicello during the relevant time period. *See id.* at 516. "Courts routinely reject statistics that are not sufficiently complete to imply a pattern of discrimination." *Id.* More importantly, Plaintiff's anecdotal evidence regarding the termination of two other Branch Managers appears to be based entirely on hearsay and speculation. (*See* Hirschberg Aff. ¶ 21.)[24] Plaintiff has put forth no evidence to rebut Defendant's legitimate and non-discriminatory reasons for those two employees' terminations and has not demonstrated that their terminations were part of a pattern of discriminating against older workers. *Saenger*, 706 F. Supp. 2d at 517 (finding plaintiff's evidence of a pattern of discrimination was "hearsay and speculation" that "cannot be used to defeat a motion for summary judgment"). In short, this evidence cannot be used to demonstrate that Defendant's stated reason for Plaintiff's termination was a mere pretext for age

---

[24]     Plaintiff also relies on Huertas' statement in his affidavit that he "know[s] that the Bank was making an effort to 'manage people out' so that they could replace them with younger, less expensive associates," and that "older managers were being written up for little things that would not have resulted in discipline in the past." (Huertas Aff. ¶ 11.) Huertas subsequently testified at his deposition that this statement was based on "rumors" and that he did not "have the facts" to support that statement. (Huertas Dep. at 112-13.)

discrimination.

### 4. Plaintiff's Remaining Evidence of Pretext

a. *Progressive Discipline Policy*

Plaintiff argues that although the Bank has a "discipline policy that progresses from verbal warning to written warning to final warning and then termination," the Bank "chose to ignore that policy as it applied to Hirschberg." (Pl.'s Opp'n at 6; *see also* Hirschberg Aff. ¶ 50.) As an initial matter, Plaintiff has not cited any record evidence providing specific factual information underlying her claim that "defendant has a policy of progressive discipline." (Hirschberg Aff. ¶ 50; *see also* Huertas Aff. ¶ 14 ("I am aware of the bank's progressive discipline policy.").) For instance, there is no evidence before the Court as to whether this was a formal written Bank policy and/or whether it was in effect at the time of Plaintiff's termination. More importantly, Plaintiff has produced no evidence that any progressive discipline policy applied to Branch Managers or was applicable to violations of the Code of Ethics.[25] *See Rupert v. City of Rochester*, 701 F. Supp. 2d 430, 443 (W.D.N.Y. 2010) ("[Plaintiff] has not shown that the violations for which he was disciplined fall within the category of violations for which progressive discipline is appropriate.")

Nor has Plaintiff produced any evidence that younger Branch Managers who admitted to cutting and pasting customer signatures received the benefit of the progressive discipline policy. *Cf. Berube v. Great Atl. & Pac. Tea Co., Inc.*, 2010 WL 3021522, at *8 (D.Conn. July 29, 2010) (noting Second Circuit's finding of pretext when the plaintiff produced evidence of four younger

---

[25] The parties do not dispute that violations of the Bank's Code of Ethics could result in immediate termination.

similarly-situated comparators who "received progressive discipline for transgressions of comparable seriousness while he did not") (internal quotation marks omitted). Plaintiff emphasizes that although Anderson "was also accused of copying and pasting [signatures] as a result of the same October 2007 audit," she was only issued a written warning and was not terminated. (Hirschberg Aff. ¶ 51.) Defendant has proffered unrebutted evidence, however, that Anderson was not a Branch Manager and that Plaintiff admitted to cutting and pasting signatures, conduct which it considered to be a violation of the Code of Ethics, but Anderson did not. In addition, Anderson's membership in the protected class tends to undercut any inference that age-based animus was behind the difference in punishments doled out by the Bank.

   b.  *Timing of Dowlatram's Discharge*

   Plaintiff also cites, as evidence of pretext, that "Dowlatram was fired nearly one (1) month after Hirschberg had already filed [a charge of discrimination] with the Equal Employment Opportunity Commission." (Pl.'s Opp'n at 7.) To the extent Plaintiff is attempting to imply that the timing of Dowlatram's termination was meant to cover up wrongdoing on Defendant's part, Plaintiff has proffered no evidence showing that the timing of Plaintiff's EEOC charge played any role in Dowlatram's termination.

   **5.**  <u>**Conclusion**</u>

   In short, the Court finds that Plaintiff has proffered no admissible evidence showing that age was a motivating factor (much less a "but for" cause) of Defendant's decision to terminate her employment. While Plaintiff has set forth her subjective belief that she was discriminated against, this is not enough – on its own – to withstand a motion for summary judgment. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (no inference of discrimination

when plaintiff "could not recall any action or statement by [the defendant] that showed age discrimination," and "could only say that [the defendant] smiled at her less approvingly" as time went on); *Holowecki*, 644 F. Supp. 2d at 353 ("Because the only evidence supporting [plaintiff's] *prima facie* case is his own subjective belief that he was discriminated against, summary judgment is appropriate."); *Vazquez v. Southside United Hous. Dev. Fund Corp.*, 2009 WL 2596490, at *9 (E.D.N.Y. Aug. 21, 2009) ("However, 'a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' in a discrimination action.") (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 127 (2d Cir. 2008)). Considering the record evidence as a whole, therefore, the Court finds that a reasonable juror could not find that Defendant's proffered reason for terminating her employment was a pretext for unlawful age discrimination.[26] Accordingly, Plaintiff's claims under both the ADEA and the NYSHRL are dismissed.

---

[26] Plaintiff cites *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148 (2000) for the proposition that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (Pl.'s Opp'n at 13.) According to Plaintiff, "[a] reasonable person on the jury could conclude that the defendant's asserted basis for its actions is false." (*Id.* at 13-14.) For the reasons set forth above, the Court finds that a reasonable factfinder would not conclude that Defendant's stated reason for terminating Plaintiff's employment was pretextual. Even if Plaintiff did prove that Defendant's asserted reason for her termination was false, she would not be relieved of the requirement "that the evidence, considered in its entirety . . . must be capable of supporting a reasonable finding that the true reason was the prohibited discrimination plaintiff alleges." *McCarthy*, 202 F.3d at 166. In this case, on the whole, there is insufficient evidence to infer that Plaintiff's age was the "but for" cause, or a motivating factor, of Defendant's decision to terminate her employment. *See id.*

*CONCLUSION*

For all the above reasons, Defendant's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
        December 1, 2010

                                          _____/s/_____
                                          Denis R. Hurley
                                          Unites States District Judge